IN THE UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

UNITED STATES OF AMERICA,

    *Plaintiff*,

v.                                              Case No. 8:12-cr-501-T-35AEP

JOSE CORDERO,

    *Defendant*.
_____/

**DEFENDANT CORDERO'S SENTENCING MEMORANDUM**

    Defendant Jose Cordero, by undersigned counsel, respectfully requests that the Court impose an imprisonment sentence of one year and one day, followed by 10 years of sex offender supervised release.  The requested sentence is "sufficient, but not greater than necessary" to achieve the purposes of sentencing as set out in section 3553(a)(2), title 18, U.S. Code.

**RELEVANT BACKGROUND AND CHARACTERISTICS OF MR. CORDERO**

    Mr. Cordero is a 33-year-old U.S. Army veteran who comes before the Court convicted of accessing the internet to view child pornography.  (PSR, ¶¶ 2, 4, 5, 8, 10, 11).  He was born and raised in Tampa.  (PSR, ¶¶ 38-39).  His parents divorced when he was three; his parents later remarried to other people; and he maintained good relationships with both his parents and step-parents.  (PSR, ¶ 39).  Mr. Cordero's childhood, overall, was fairly average and typical.  (PSR, ¶ 39).

In 1999 Mr. Cordero graduated from Tampa Bay Technical School. (PSR, ¶ 56). In 2000 at the age of just 20, Mr. Cordero married a Doris Raimundi. And by 2001, Mr. Cordero had enlisted in the U.S. Army Reserves. (PSR, ¶ 46, 58). By 2005 Mr. Cordero had achieved the rank of sergeant and was serving as a counterintelligence agent for Joint Task Force Guantanamo "in support of Operation ENDURING FREEDOM and the Global War on Terror." (Attachment, Medal Citation). He served in Guantanamo for a year and received a Joint Service Commendation Medal for "his outstanding foresight, attention-to-detail, and follow-up procedures while performing counter surveillance security for military commissions hearings." (Attachment, Medal Citation). His "technical expertise and professionalism contributed directly to the intelligence collection effort and overall force protection posture of Joint Task Force Guantanamo." (Attachment, Medal Citation).

During Mr. Cordero's exemplary service at Guantanamo, his wife was back home cheating on him; Mr. Cordero divorced her in 2006 as a result. (PSR, ¶ 46). The incident in 2006, the same year as the instant offense, proved quite stressful and psychologically debilitating for Mr. Cordero.

Mr. Cordero received an honorable discharge on April 21, 2008, at the rank of sergeant. The next day, he received his commission as a reserve warrant officer. He trained and served as a Blackhawk helicopter pilot in a medical evacuation company and was scheduled for deployment to Afghanistan when Mr. Cordero's offense from 2006 came to light. In 2011 Mr. Cordero's platoon leader gave him a glowing evaluation about his "[e]xceptional performance." (PSR, ¶¶ 58-59; Attachment, Officer Eval.)

According to the evaluation, Mr. Cordero's performance was "nothing short of outstanding." He went "above and beyond to distinguish himself as one of the most valued officers in the platoon and in the company. His tireless efforts have brought great success on F Company and this is a direct reflection of his work ethic, organization, and professionalism." Mr. Cordero even used "the limited resources that F co had in the Aviation Life Support Equipment shop and made sure that all the crewmembers in the company were equipped and trained on the new air warrior system." That equipment training addressed "issues for the up coming [sic] deployment." The platoon leader noted that Mr. Cordero was "[e]asily in the top of his peer group" and "highly capable and fully autonomous in action." Moreover, Mr. Cordero was "very respected and valued amongst his peers for his dependability." The platoon leader recommended Mr. Cordero for "track producing school and [promotion] as soon as possible." (Attachment, Officer Eval.).

After Mr. Cordero's divorce, he started dating Amanda Hellriegal, a woman he had been friends with at work. (PSR, ¶ 47-48). They married in 2009 after three years of dating. (PSR, ¶ 47). Together, they have one toddler son, who was born with Down's Syndrome; they now are expecting a second child. (PSR, ¶ 47). Ms. Cordero confirms that Mr. Cordero "is very loyal" and "is an excellent father." (PSR, ¶ 48). He is the type of friend who "bends over backwards to help others, sometimes to [his] detriment financially." (PSR, ¶ 48). Such reported generosity is consistent with the volunteer work that Mr. Cordero has done over the years.

## SEX OFFENDER EVALUATION AND RISK ASSESSMENT

Dr. Suzonne M. Kline conducted a sexual offender evaluation and risk assessment of Mr. Cordero, and the Court, the Government, and U.S. Probation have a copy of Dr. Kline's written report (hereinafter, "Kline Report"). In her report, Dr. Kline concludes that "[t]here is no evidence of a Sexual Disorder (i.e., Paraphilia/Pedophilia) as defined by the [DSM-IV-TR]…." (Kline Report at 1). She also did not find evidence of psychopathy, something ordinarily associated with risk of criminality and re-offense. (Kline Report at 1). Mr. Cordero also did not indicate any "specific sexual interest in children." (Kline Report at 1). In turn, Mr. Cordero is a low risk to the community; indeed, she does not even recommend therapy or treatment specific to sex offenders. (Kline Report at 1). Rather, Dr. Kline recommends that Mr. Cordero obtain more generalized mental health treatment to assist him in exploring what internal motivations in fact did lead Mr. Cordero to access child pornography in the first place. (Kline Report at 1).

Based on Mr. Cordero's lack of criminal history and lack of prior sexual exploitation, Dr. Kline concludes that his risk of reoffending "is considered to be the lowest of offenders—at approximately 1.3% for a future contact offense, 5.3% for a future non-contact sexual offense, and approximately 4.4% for a subsequent child pornography offense over six years post release and/or placement in the community." (Kline Report at 6). Dr. Kline goes on to note that research shows that the recidivism rate for online offenders "overall is low and there is no research supporting the notion that

viewing child pornography is a gateway to hands-on offending behavior." (Kline Report at 6).

## ACKNOWLEDGED ISSUES WITH CURRENT CHILD PORNOGRAPHY GUIDELINE REGIME

As Dr. Kline notes in her report, the U.S. Sentencing Commission recently released a report that acknowledges problems with the non-production child pornography sentencing scheme. *See* United States Sentencing Commission, *Executive Summary: Report to Congress: Federal Child Pornography Offenses,* available for download at http://www.ussc.gov/Legislative_and_Public_Affairs/Congressional_Testimony_and_Reports/Sex_Offense_Topics/201212_Federal_Child_Pornography_Offenses/Executive_Summary.pdf (last visited May 15, 2013) (hereinafter, "USSC Report").

In the report, the Sentencing Commission publicly recognized the following:

> [M]ost stakeholders in the federal justice system consider the non-production child pornography sentencing scheme to be seriously outmoded. Those stakeholders, including sentencing courts, increasingly feel that they "are left without a meaningful baseline from which they can apply sentencing principles" in non-production cases.

(USSC Report at iii) (footnotes omitted). Results echoed the prevailing finding in scientific research in this area and reiterated that research "has not established that viewing child pornography 'causes' the typical offender to progress to other sex offending against minors…. Child pornography offenders engage in a variety of behaviors reflecting different degrees of culpability and sexual dangerousness." (USSC Report at vii) (italics and heading omitted). As Dr. Kline notes, the Commission's own

5

research, then, contradicts the notion that child pornography possession necessarily leads to hands-on sexual offenses against minors.

The Commission explained that it compiled the report in large part due to the increasing rate of below-guideline sentences for offenders sentenced under USSG § 2G2.2, pursuant to its statutory duty to "consider whether the guidelines are in need of revision in light of feedback from judges as reflected in their sentencing decisions," and because "as a result of recent changes in the computer and Internet technologies that typical non-production offenders use, the existing sentencing scheme in non-production cases no longer adequately distinguishes among offenders based on their degrees of culpability." (USSC Report at ii).

The Commission explained that because the enhancements for computer use and type and volume of images "now apply to most offenders," the guideline "fail[s] to differentiate among offenders in terms of their culpability." (USSC Report at iii, xi). The Commission ultimately concluded, and has formally recommended to Congress, that the federal sentencing guidelines for non-production child pornography offenders should be significantly revised to reflect the "recent technological changes in offense conduct and emerging social science research about offenders' behaviors and histories, and also to better promote the purposes of punishment by accounting for the variations in offenders' culpability and sexual dangerousness." (USSC Report at xvii). According to the Commission, "[t]he current sentencing scheme in §2G2.2 places a disproportionate emphasis on outdated measures of culpability regarding offenders' collecting behavior

and insufficient emphases on offenders' community involvement and sexual dangerousness." (USSC Report at xx).

Incorporating the Commission's report into her own assessment, Dr. Kline opines that the Commission "was speaking to cases such as Mr. Cordero, where prior history and current risk assessment by a qualified, licensed professional suggests low risk of further criminal activity, sexual or otherwise." (Kline Report at 7). Dr. Kline notes that Mr. Cordero "shows many positive characteristics such as a strong sense of self-worth and self-regulation and has a supportive, social system in the community. These factors work to mitigate, or reduce, his risk to commit sexual offenses in the future." (Kline Report at 7).

**A SENTENCE OF ONE YEAR AND ONE DAY IN PRISON PLUS TEN YEARS OF SEX OFFENDER SUPERVISED RELEASE BEST SATISFIES THE SENTENCING GOALS OF SECTION 3553(a)**

The Court of course must "impose a sentence sufficient, but not greater than necessary, to comply with the purposes set forth in paragraph (2)," which are "the need for the sentence imposed—

> (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
>
> (B) to afford adequate deterrence to criminal conduct;
>
> (C) to protect the public from further crimes of the defendant; and
>
> (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner."

18 U.S.C. § 3553(a)(2).  In "determining the particular sentence to be imposed," the Court must consider these purposes, the nature and circumstances of the offense and the history and characteristics of the defendant, the need to avoid unwarranted disparities, the types of sentences available, the kinds of sentences and the advisory guideline range determined for the particular offense, pertinent policy statements, and the need to provide restitution to any victims of the offense.  *See* 18 U.S.C. § 3553(a)(1)–(7).

  A. *Need for Sentence to Reflect Seriousness of Offense, Promote Respect for the Law, and Provide Just Punishment; and Need to Provide General Deterrence.*

  The offense of conviction here is serious.  Mr. Cordero acknowledges and understands this.  Indeed, he extremely remorseful.  Because of the seriousness of this offense, the Eleventh Circuit has come close to expressly requiring some incarceration in almost all child pornography cases in order to satisfy these sentencing purposes.  *See United States v. Pugh*, 515 F.3d 1179, 1195-96, 1198-99 (11th Cir. 2008).  The question here is whether a sentence within the range of 37 to 46 months is greater than necessary to accomplish these purposes.  Mr. Cordero submits that it is.

  The offense occurred in 2006.  Mr. Cordero has not committed a similar offense since then.  In the four years between the time he committed the offense and the time it was detected, the two years between when it was detected and when he was charged, and during the several months of pretrial supervision, Mr. Cordero has not committed a new offense.

  In addition, Mr. Cordero is a true first offender—no arrests, no convictions.  His offense was a clear aberration.  He graduated from high school, has some college education, and served dutifully and honorably in the military.  He has no history of drug

8

or alcohol abuse. A sentence of incarceration below the advisory range, under the circumstances, would be sufficient but not greater than necessary to provide for just punishment. *Cf. United States v. Howe*, 543 F.3d 128 (3rd Cir. 2008) (variance based on "isolated mistake" in otherwise long and entirely upstanding life); *United States v. Hadash*, 408 F.3d 1080, 1084 (8th Cir. 2005) (defendant was a "law abiding citizen, who [did] an incredibly dumb thing").

Of course, simply the felony conviction and the sex offender label will continue to be punishment for Mr. Cordero, and any public benefit of incarceration beyond a year and a day would be marginal at best. As this Court observed, there can be little question that a conviction for a felony "tends to 'gravely besmirch' a person's reputation. As the Supreme Court noted, a felony is 'as bad a word as you can give to a man or thing.' Convicted felons cannot vote, sit on a jury, serve in public office, possess a firearm, obtain certain professional licenses, or obtain federal student loan assistance." *Shelton v. Secretary, Dept. of Corrections*, 802 F. Supp. 2d 1289, 1302 (M.D.Fla. 2011) (quoting *Morissette v. U.S.*, 342 U.S. 246, 260, (1952)).

The label of "convicted felon," combined with a proclamation that Mr. Cordero is a sex offender, "creates irreparable damage to [his] reputation and standing in the community. This social stigma precludes, for example, [his] ability … to reside in any neighborhood of his choosing or to obtain certain employment." *Shelton*, 802 F. Supp. 2d at 1302; *see also United States v. Cruikshank*, 667 F. Supp. 697, 703 (S.D.W. Va. 2009) (noting "stigma" of defendant's child pornography conviction and limitations on where he could work and live, in support of incarceration sentence that varied downward

by nearly 40 months); *United States v. Baird*, 580 F. Supp. 2d 889, 894 (D. Neb. 2008) (imposing downward varying incarceration sentence, noting "considerable stigma" that child pornography conviction carries and fact that as a result, defendant lost his military career and will have to register as a sex offender).[1]

Finally, the Government has indicated that it does not object to a sentence below the currently calculated advisory range of 37-46 months based on Mr. Cordero's honorable military service. In other words, a lower sentence to recognize his service would still be just punishment in Mr. Cordero's particular case. Indeed, the guidelines acknowledge, as a policy matter, that military service may be relevant as offender characteristic in determining whether a sentence below the advisory range is warranted. *See* USSG § 5H1.11 (2012). As the Sentencing Commission has recently noted, in cases involving veteran-defendants and a sentencing court's decision to depart or vary below the advisory guideline sentencing range, one important consideration is "the type of service and whether it warrants consideration based on a traditional practice of recognizing military service to one's country." Office of General Counsel, U.S. Sentencing Commission *Case Annotations and Resources- Military Service- USSG §5H1.11 Departures and Booker Variances*, (Jan. 2012), available for download at which can be found at http://www.ussc.gov/Legal/Primers/2012_01_Military_Service_5H1-11_Departures_Booker_Variances.pdf (last visited May 15, 2013).

---

[1] *See also United States v. Garate*, 543 F.3d 1026, 1028 (8th Cir. 2008) (on remand from the Supreme Court for reconsideration in light of *Gall*, overruling its prior holding that it was inappropriate for the district court to consider the lasting effects of being required to

A sentence of one year and one day; plus the felony conviction, the sex offender supervised release that will follow, and the sex offender label; together will be sufficient to reflect the seriousness of this particular offense, accomplish just punishment, and promote respect for the law.  It also will be sufficient to send a message to all other potential offenders that this type of offense will be detected and prosecuted and result in serious, life-altering consequences.

B.    *Need for Incapacitation and to Protect the Public.*

For all male offenders in Criminal History Category I, the recidivism rate is 15.2%.  For those in their mid-30s at the time of sentencing, like Mr. Cordero is, the rate in Category I is 14.6%.  For those with some college, the rate in CHC I is 13.9%; and for those who were ever married, the rate is 9.8%.  For those with no history of illicit drug use, the recidivism rate is half that of those who do have a drug history (10.8% versus 21.9%).  Overall, the recidivism rate for a man like Mr. Cordero is quite low.  *See* U.S. Sent'g Comm'n, *Measuring Recidivism: The Criminal History Computation of the Federal Sentencing Guidelines* at 28, 29 (May 2004)[2] (hereinafter *Measuring Recidivism*).

Offenders like Mr. Cordero with zero criminal history points have a rate of recidivism of 11.7%, half that of offenders with one criminal history point.  *See* Sent'g

---

[2] Available for download at http://www.ussc.gov/Research/Research_Publications/Recidivism/200405_Recidivism_Criminal_History.pdf (last visited on May 15, 2013).

Comm'n, *Recidivism and the "First Offender,"* at 13-14, 26 (May 2004)[3] (hereinafter *First Offender*). The rate, when controlled to just those with no criminal history points and no arrests, goes down to 6.8%. *Id.* at 13, 26 & n.25. According to the report, first offenders with no criminal history points and no arrests pose "the lowest recidivism risk of all." *Id.* at 17. The Commission has recognized the advisability of revising the guidelines to take first offender status into account. *See First Offender* at 1-2 (identifying goal of "refin[ing] a workable 'first-offender' concept within the guideline criminal history structure").

Dr. Kline's report also notes Mr. Cordero's extremely low risk of recidivism. Indeed, she observes that his risk of reoffending "is considered to be the lowest of offenders." (Kline Report at 6). Mr. Cordero "is a very low risk of committing future sexual offenses" of either a contact or pornography possession type. (Kline Report at 8). A very significant factor in her assessment is perhaps the most obvious. Mr. Cordero has been living in the community throughout the investigation without any violations. (Kline Report at 9). Since December 2012, he has been under pretrial supervision without any reported issues. (Kline Report at 9). Mr. Cordero's offense occurred in 2006, and he freely admitted it when confronted with it years later. There is no evidence that he has committed any further offenses of this type or any other sexual type since then. Dr. Kline notes the following:

---

[3] Available for download at http://www.ussc.gov/Research/Research_Publications/Recidivism/200405_Recidivism_First_Offender.pdf (last visited on May 15, 2013).

> As a whole, the scientific literature studying sexual offender recidivism shows that, within the smaller number of sex offenders who go on to reoffend, the majority do so within the first three years post- release or community placement with many re-offenses occurring during the first year. Thus, Mr. Cordero has already passed the most significant time period when looking at his particular risk and recidivism.

(Kline Report at 6).

Equally as important is the fact that Mr. Cordero has a strong and supportive family and social network, and he is psychologically well-adjusted; these factors further lessen his risk of re-offense. (Kline Report at 9). Dr. Kline indicates that Mr. Cordero "is a good candidate for placement in the community with outpatient treatment and supervision." (Kline Report at 9). In addition, Mr. Cordero will be on sex offender supervised release, and that mechanism and its close monitoring will further ensure Mr. Cordero does not offend again.

In imposing the least sentence sufficient to account for the need to protect the public from further crimes of Mr. Cordero, this Court should consider the statistically low risk of recidivism presented by Mr. Cordero's history and characteristics. *See, e.g.*, *United States v. Darway,* 255 Fed. Appx. 68, 73 (6th Cir. 2007) (upholding downward variance on basis of defendant's first-offender status); *United States v. Urbina*, Case No. 06-cr-336, 2009 WL 565485, *3 (E.D. Wis. Mar. 5, 2009) (considering low risk of recidivism indicated by defendant's lack of criminal record, positive work history, and strong family ties); *United States v. Cabrera*, 567 F. Supp. 2d 271, 279 (D. Mass. 2008) (granting variance because defendants "with zero criminal history points are less likely to recidivate than all other offenders").

C.   *Kinds of Sentences Available.*

The maximum sentence for the offense here is ten years. The Court may also impose up to a lifetime of sex offender supervised release. The prison sentence of one year and one day in this case will be sufficient to punish in Mr. Cordero's case, while the restrictions of sex offender supervised release will allow the Court to further ensure the protection of the public when Mr. Cordero is released. A lengthier period of supervised release here also will ensure that Mr. Cordero obtains some level of evaluation and treatment as noted by Dr. Kline.

D.   *Avoiding Unwarranted Sentencing Disparities and Consideration of Sentencing Commission Policy Statements.*

"Unwarranted disparity is defined as different treatment of *individual* offenders who are similar in relevant ways, or similar treatment of *individual* offenders who differ in characteristics that are relevant to the purposes of sentencing." U.S. Sent'g Comm'n, *Fifteen Years of Guidelines Sentencing: An Assessment of How Well the Federal Criminal Justice System Is Achieving the Goals of Sentencing Reform* 113 (2004) (emphasis in original). In declining to follow § 2G2.2 on policy grounds, this Court will be in good company. Seventy percent of district court judges believe that the guideline range for possession of child pornography is too severe. *See* U.S. Sent'g Comm'n, *Results of Survey of United States District Judges*, Question 8 (2010).[4] And 83% believe that sentences other than straight imprisonment should be made more available under the guidelines for child pornography cases, whether probation (19%),

---

[4] Available for download at
http://www.ussc.gov/Research/Research_Projects/Surveys/20100608_Judge_Survey.pdf
(last visited on May 15, 2013).

14

probation with community or home confinement (23%), or a split sentence of incarceration with community or home confinement (41%). *Id.*, Question 11.

In published opinions, several district courts have documented the now-acknowledged flaws of section 2G2.2 to justify giving less weight to the advisory ranged calculated under that guideline and varying downward. *See, e.g., United States v. Cruikshank*, 667 F. Supp. 2d 697, 702 (S.D.W. Va. 2009); *United States v. Johnson*, 588 F. Supp. 2d 997, 1003-04 (S.D. Iowa 2008); *United States v. Baird*, 580 F. Supp. 2d 889, 892 (D. Neb. 2008); *United States v. Beiermann*, 599 F. Supp. 2d 1087, 1100-04 (N.D. Iowa 2009).

The Commission itself acknowledges the issues involved with the pornography guideline, in particular its inherent failure to account for relative culpability across various types of persons who possess child pornography. In fact, the Commission's recent report was in response to the growing number of downward variances in child pornography cases. This Court has the discretion to take into account the flaws of the guideline applicable here when considering the appropriateness of an imprisonment sentence below the advisory range the guideline calls for.

## CONCLUSION

For the foregoing reasons, a sentence of one year, one day, in prison, plus ten years of sex offender supervised release, is one that is sufficient, but not greater than necessary, to accomplish the purposes of sentencing.

Respectfully submitted,

DONNA LEE ELM
FEDERAL PUBLIC DEFENDER

*/s/ Adam S. Tanenbaum*
ADAM S. TANENBAUM
Florida Bar No. 117498
Assistant Federal Public Defender
400 North Tampa Street, Suite 2700
Tampa, Florida 33602
Telephone: (813) 228-2715
Facsimile: (813) 228-2562
Email: Adam_Tanenbaum@fd.org
*Counsel for Mr. Cordero*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 15th day of May, 2013, a true copy of the foregoing sentencing memorandum and its attachments was submitted to the Clerk of the Court using the CM/ECF system, which will send notice of the electronic filing to Assistant United States Attorney Jennifer L. Peresie.

*/s/ Adam S. Tanenbaum*
ADAM S. TANENBAUM
Assistant Federal Public Defender